■ CONSTANTINA FIEDERLEIN, Individually and as Administratrix of the Estate of WILLIAM FIEDERLEIN, Deceased, Respondent, v CITY OF NEW YORK HEALTH AND HOSPITALS CORPORATION, Appellant. — Judgment of the Supreme Court, New York County, entered on October 19, 1979 after a jury trial and verdict in favor of plaintiff in the sum of $152,920.50, unanimously reversed, on the law, and the complaint dismissed without costs. On the two causes of action submitted to it, the first for conscious pain and suffering occasioned by the alleged malpractice of a physician in defendant's employ, and the second for wrongful death, the jury found for plaintiff. As to the first, it found plaintiff entitled to damages in the sum of $150,000; in the second, the jury made no award. Plaintiff's son, a Phi Beta Kappa graduate of New York University, was a patient in the Bellevue Psychiatric Ward during the fall of 1974 and January, 1975. He was awaiting an opportunity to become a patient and obtain a bed at the Columbia Psychiatric Institute. After being released on a pass authorized by the resident physician in defendant's psychiatric division at Bellevue Hospital on January 30, 1975, plaintiff's son's body was discovered floating in the Hudson River near the George Washington Bridge on March 23, 1975. On prior occasions plaintiff's son was found on the George Washington Bridge. The evidence is vague as to whether he attempted rather than threatened to commit suicide. In any event, there was no evidence to show that, in fact, decedent's death was the result of suicide. It is plaintiff's claim that her son's death was the result of malpractice by defendant's physician in issuing the pass in light of decedent's psychiatric history, and in prescribing treatment to her son without supervision of a qualified psychiatrist. The trial court ruled that plaintiff's expert witness, in testifying that he would not have authorized the pass and that the treatment prescribed for decedent was inappropriate, created issues of fact as to malpractice and wrongful death which required submission to a jury. It is not disputed that the attending physician, a first-year resident in psychiatry, afforded the patient his best medical judgment. In *Centeno v City of New York* (48 AD2d 812, 813, affd 40 NY2d 932), we held that: "Disagreement between professional experts does not in these circumstances provide the basis for a holding that a prima facie case of malpractice was presented requiring jury consideration. 'The decision to release the patient from the hospital and place him on convalescent status was a medical judgment and the decision to continue him on convalescent outpatient status after February, 1955 and to discharge him in June were also matters of professional medical judgment. Although another physician might disagree as to the form and period of treatment to be followed, a liability would not arise; nor would it arise if the professional judgment to discharge him was in fact erroneous. *(St. George v. State of New York,* 283 App. Div. 245, affd. 308 N.Y. 681; *Warner v. Packer,* 139 App. Div. 207; *Pike v. Honsinger,* 155 N.Y. 201.)* The prediction of the future course of a mental illness is a professional judgment of high responsibility

and in some instances it involves a measure of calculated risk. If a liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated. This is one of the medical and public risks which must be taken on balance, even though it may sometimes result in injury to the patient or others.' (Bergan, J. in *Taig v State of New York*, 12 AD2d 182, 183.)" Unlike *Cohen v State of New York* (51 AD2d 494), the hospital records reflect that the treatment of plaintiff's son by the attending physician was indeed supervised by a superior medical officer who was a qualified psychiatrist. Not only do the initials of the qualified psychiatrist appear on the medical records at or about the day in question, but there was testimony that the qualified psychiatrist had interviewed the patient "periodically". We cannot conclude, as did the Trial Justice, that these notations by the qualified psychiatrist were without significance. The fact that on the day before the final pass was issued the attending physician did not see the nurse's notes in which she characterized the plaintiff's son as "wasting away", cannot, standing alone, be the fulcrum upon which a charge of malpractice can rest. Although the attending physician testified that had he seen the notes he would not have authorized the pass, there was testimony of a statement attributed to the qualified psychiatrist, the supervising medical officer, that "regardless of what he [patient] told the nurses now * * * this boy will not commit suicide." In every medical judgment there is a risk of error, but mere error in medical judgment does not give rise to a viable claim of medical malpractice. In any event, the jury found no damages on the wrongful death cause of action. Putting to one side the fact that suicide was not established by direct or circumstantial evidence, the record is lacking in proof that plaintiff's son consciously experienced such pain and suffering as to entitle plaintiff to the damages found by the jury. Although we are mindful of the tragic circumstances of this case and the meaning of plaintiff's son's loss of life to herself and her family, upon the entire record the evidence was insufficient to submit to the jury issues of conscious pain and suffering arising from malpractice and wrongful death. The complaint is dismissed. Concur — Birns, J.P., Ross, Lupiano, Silverman and Bloom, JJ.